**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Sheila Levy**</u>

    **v.**                             Case No. 10-cv-374-PB
                                         Opinion No. 2012 DNH 080
<u>**Todd Lique et al.**</u>

<u>**MEMORANDUM AND ORDER**</u>

Sheila Levy filed suit in the Grafton County Superior Court against Todd Lique, an officer of the Lebanon Police Department ("LPD"), M. James Alexander, the Chief of Police for the LPD, the City of Lebanon, and unknown LPD officers. She asserted four claims for relief: (1) a Fourth Amendment excessive force claim against Lique and unknown LPD officers; (2) a state law claim of assault and battery against Lique and unknown LPD officers; (3) a Section 1983 failure to train and supervise claim against Chief Alexander; and (4) a state law negligent training and supervision claim against Chief Alexander and the City of Lebanon. Defendants removed the case to this court. The parties have filed cross-motions for summary judgment. For the reasons provided below, I deny both Levy and Lique's motions and grant Chief Alexander and the City's motion.

1

## I.   BACKGROUND

Levy and defendants present two dramatically different versions of the events that transpired in front of the Colonial Deli Mart in Lebanon, New Hampshire on August 5, 2007.  I describe each version in turn.

### A.   Levy's Version

On the morning of August 5, 2007, Levy drove her thirteen-year-old daughter, Skye, and their cats and dogs to a riverbank in Lebanon to give the pets a bath.  At some point, one of her dogs got loose and ran off into the woods.  Believing that he would come back and would not bother anyone, Levy decided to go to the Colonial Deli Mart to get lunch for herself and her daughter before returning to retrieve the dog.

Approximately five minutes after she arrived at the front of the store, Officer Lique approached her in the parking lot.  His first comment to her was "take your daughter and go back to where your dog got loose."  Levy's Dep. at 40, Doc. No. 24-2.  When she responded that she would first get lunch and then go find her dog, Lique said to another officer who arrived on the scene shortly after Lique, "Perkins, grab her.  I'm taking her in."  Id. at 42.  The two officers then grabbed Levy, picked her

up by her arms, and took her to the police cruiser.  Skye ran
over to the other side of the cruiser.

Once in front of the cruiser, Lique told Perkins to clear
the area.  He then opened the door and shoved Levy into the
cruiser.  While holding her left arm, Lique began punching Levy
in the stomach with a full fist.  She begged him to stop but he
continued to punch her, landing eight punches total.  He then
reached for what Levy believed was a taser and tasered her left
arm approximately thirty times and her lower back twice.  The
tasering lasted approximately six minutes.  At one point during
the assault, Levy shouted to Skye to run away and call her
grandfather, but Lique told Skye that she had to stay next to
the cruiser.

After he finished tasering Levy, Lique exited the car and
went to speak with Skye.  Levy remained in the cruiser.  Soon
after that an ambulance arrived.  Levy felt paralyzed and could
not even talk.  She was strapped onto a gurney without
resistance and taken to the Dartmouth-Hitchcock Medical Center
("DHMC").  She was then transferred to the New Hampshire State
Hospital, where she remained for eighteen days.

During her stay at the state hospital, Levy showed the

3

bruises that resulted from Lique's beating and tasering to numerous staff members.  She asked them to take pictures of the bruises but they refused.  She also showed her bruises to the attorney who represented her in connection with the involuntary hospital admission, as well as to her father and daughter.

**B.   The Police Officers' Version**

On August 4, 2007 – the day before the incident – a person approached Lique to report that Levy was sleeping in her van at a nearby auto repair shop.  Lique spoke to Levy and noted that her mental capacity seemed diminished.  When she denied needing assistance, he left.

Around 4:00 a.m. the next day, someone called the police regarding Levy.  Levy reportedly told the caller that the police were looking for her, that they were setting up road blocks to catch her, and that she was bleeding.  The caller noted that Levy was not actually bleeding.

Later that day, around noontime, an employee at the Colonial Deli Mart called the police to report that Levy was confronting and bothering customers outside the store.  She also reported that Levy had told her that she was wanted by the police.  Lique responded to the scene and approached Levy.  He

found her in her van with her daughter and several animals.  She seemed angered by his presence and appeared to be "far worse" than the day before.  Levy could not remember her name, the date, where she was or had been, or things said to her just seconds before.  She kept talking in circles and asking Lique who he was even after he identified himself as an officer of the LPD.

Several minutes into the conversation, Levy told Lique that she did not have to talk to him, rolled up the window of her car, and left the parking lot.  She drove into the parking lot of a store next door to the Deli Mart.  While she was there, Lique spoke with the Deli Mart employee who had placed the call. The employee stated that she had known Levy for a long time and that Levy was acting "irrationally."  She also told Lique that Levy's mental state had always been "a little off" but that her condition had worsened that day to such an extent that the employee was concerned for Levy and her daughter's welfare.

Based on his observations of Levy on that day and the day before, as well as the Deli Mart employee's comments, Lique believed that Levy was a danger to herself and her child.  He informed Officer Perkins that he believed this was a protective

custody issue.  The two proceeded to the nearby parking lot
where Levy had parked her van.  As they approached the van, Levy
tried to slam shut the driver's side door, but Lique prevented
her from doing so.  He opened the door to full extension and
began speaking with her again.

Levy "began to act irrationally once again and began
screaming."  Lique's Police Report at 2, Doc. No. 28-13.  Lique
informed her that he was placing her in protective custody and
asked her to step outside the vehicle.  Levy then "began
screaming even louder and launched herself into the passenger's
side seat" where her daughter was seated.  Id.  The officers
attempted to grab Levy from the driver's side but she prevented
them by kicking her legs.  Perkins then went to the passenger's
side and began attempting to remove her from the vehicle.  Lique
joined him.  "Levy was then forcibly removed from the van by the
upper torso, as she refused to comply with the orders given to
her."  Id.

Once she was outside the van, Levy continued to physically
struggle against the officers and ignored their orders to stop.
After a "brief struggle," the officers "forcibly handcuffed her"
and attempted to place her into the police cruiser.  Id.  She

6

was "kicking and struggling wildly" to prevent being placed into the vehicle until Perkins "picked [her] up . . . and placed [her] into his cruiser." Id. Levy responded by kicking at the windows of the vehicle.

At some point during their attempt to detain Levy, Lique contacted the local fire department for assistance. An ambulance arrived on the scene. Levy was strapped into a gurney, placed into the ambulance, and transported to the DHMC.

After examining her, the doctors at the DHMC noted that Levy was exhibiting auditory hallucinations and paranoia associated with a psychotic mental state. They concluded that she required involuntary admission to the state hospital for her own protection. Levy was treated at the state hospital for eighteen days. Her medical records show that she suffered from schizophrenia.

Dr. Albert Druktenis, the defense medical expert who reviewed Levy's medical records, opined that "[s]he has only been marginally stabilized on antipsychotic medication, never completely losing paranoid symptoms; and with periods of decompensation becoming acutely psychotic, delusional, and hallucinating." Doc. No. 24-3 at 6. He further opined that on

the day of the incident, Levy

> was exhibiting acute psychotic symptoms including
> paranoia, delusional thinking, hallucinations, and
> misperception of reality.  People who knew her that
> day saw this as a worsening of her well-known
> condition; and records from the Lebanon Police
> Department, DHMC, and NHH [the state hospital] confirm
> that she was acutely psychotic.

Id.  Dr. Druktenis concluded that "there is very strong

evidence that [Levy's] claims against the Lebanon Police

Department spring from unreliable psychotic thinking."  Id.

at 7.

     None of the medical records from the DHMC or the state

hospital note any bruises or marks on Levy's arms or torso.

Neither Lique nor Perkins carried or used a taser on Levy.  In

fact, in 2007, the LPD did not issue tasers to its officers, and

no officer was authorized to carry a taser until 2010.


## II.  <u>STANDARD OF REVIEW</u>

     Summary judgment is appropriate when the record reveals "no

genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The evidence submitted in support of the motion must be

considered in the light most favorable to the nonmoving party,

drawing all reasonable inferences in its favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

On cross motions for summary judgment, the standard of review is applied to each motion separately.  See Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006) (applying the standard to each motion where cross motions were filed); see also Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review.").  Hence, I must determine "whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Group, Inc. v. Ferré Dev.,

Inc., 241 F.3d 103, 107 (1st Cir. 2001).


### III. **ANALYSIS**

Levy moves for summary judgment on the ground that the defendants' version of the events demonstrates that she is entitled to relief on all claims as a matter of law.  Lique cross-moves for summary judgment and argues that Levy's evidence should be disregarded as unreliable and the motion decided based on his evidence, which shows that his actions were authorized and did not violate Levy's rights.  Lastly, Chief Alexander and the City of Lebanon contend that they are entitled to summary judgment because Levy has presented no evidence that they failed to train or supervise Lique on the use of force in the course of an arrest.  I examine each motion in turn.

### A.  **Levy's Motion**

Levy argues that she is entitled to summary judgment on all claims even if they are considered in light of the version of the events most favorable to defendants.  I disagree.

### 1.  **Excessive Force Claim**

With respect to her excessive force claim against Lique, Levy argues that "there is no genuine issue of material fact as

to whether Defendant Lique used objectively unreasonable force in seizing her because the detention itself was per se unreasonable."  Doc. No. 28-2 at 7.  She does not assert a separate Fourth Amendment claim for unlawful arrest.

After speaking with both Levy and the person who called to complain about Levy confronting Deli Mart customers, Lique informed Levy that he was placing her in protective custody.  To place a person in protective custody, an officer must have a "reasonable suspicion to believe that the person may be suffering from a mental illness and probable cause to believe that unless the person is placed in protective custody the person poses an immediate danger of bodily injury to [herself] or others."  N.H. Rev. Stat. Ann. § 135-C:28.  Levy concedes that Lique had reasonable suspicion that she was suffering from a mental illness but argues that he had no probable cause to believe that she posed a threat of harm to herself or others.

Even assuming that she was detained without probable cause, Levy cannot prevail on her excessive force claim on that ground alone.  When an officer arrests a person without probable cause "but use[s] no more force than would have been reasonably necessary if the arrest or the detention were warranted, the

11

plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force." Cortez v. McCauley, 478 F.3d 1108, 1126 (10th Cir. 2007); see Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007) ("That the deputies' arrest of [the plaintiff] was unlawful on the facts alleged does not, however, mean that any force used by the deputies to effectuate the arrest was necessarily excessive. Rather, [the plaintiff's] excessive force claim is separate and distinct from her unlawful arrest claim, and we must therefore analyze the excessive force claim without regard to whether the arrest itself was justified."); Bashir v. Rockdale Cnty., Ga., 445 F.3d 1323, 1332 (11th Cir. 2006) ("[W]here an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim."). Hence, Levy's excessive force claim does not turn on the lawfulness of her arrest. Regardless of whether Lique had probable cause to place Levy in protective custody, she can succeed on her excessive force claim only if the amount of force that Lique used was more than would have been justified if the arrest had been lawful.

12

"Whether the force used to effect a particular seizure is reasonable 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  The court must also take into account "the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.  Because the reasonableness test is an objective one, the officer's subjective motivation that prompted the use of force is inconsequential.  Id. at 397.  One factor that the courts consider in determining whether a given use of force was objectively reasonable is whether a person was actively resisting arrest.  Id.

Levy has assented to the defendants' version of the events for the purpose of her motion.  Viewing those facts from the perspective of a reasonable officer, a jury could find that Lique's use of force to arrest Levy was objectively reasonable. When he informed Levy that he was placing her in protective custody, she had a "duty to submit to arrest and refrain from

13

using force or any weapon in resisting it, regardless of whether there [was] a legal basis for the arrest." N.H. Rev. Stat. Ann. § 594:5.  Instead, Levy refused to step outside her vehicle, moved into the passenger seat, and began kicking her legs at the officers to prevent them from extracting her from the vehicle. Levy thereby resisted arrest, which could constitute a criminal offense under New Hampshire law even if the arrest was unlawful. Id. § 642:2; see State v. Beauchesne, 151 N.H. 803, 818 (2005) ("The purpose behind the law that resisting even an illegal arrest or detention constitutes a crime is to foster the effective administration of justice, to discourage self-help and to provide for the safety of police officers.").  Lique and Perkins responded to Levy's resistance by "forcibly remov[ing] [her] from the van by the upper torso."  When she continued to physically struggle against the officers once outside the vehicle, they "forcibly handcuffed her," "picked [her] up . . . and placed [her] into [the] cruiser."

Because Levy persisted in her combative behavior and refused to comply with verbal commands from the officers to submit to the arrest, a jury could conclude that it was reasonable for Lique to use progressively greater force to

subdue her.  See Statchen v. Palmer, 2009 D.N.H. 137 at *20-21 (2009) (officers are entitled to use physical force sufficient to subdue an individual who refuses to submit to arrest).  And although the police report is vague as to the exact nature of the force the officers used to subdue Levy, a jury could conclude that the force used was no more than necessary to overcome her resistance.  Therefore, I deny Levy's motion with respect to the excessive force claim.

### 2.   **Assault and Battery**

Levy makes the same untenable argument with respect to her assault and battery claim.  She contends that any force he used to effect her unlawful arrest renders him liable for assault and battery.

In New Hampshire, justification is a complete defense to any civil action, and "[a] law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest or detention . . . unless he knows that the arrest or detention is illegal." N.H. Rev. Stat. Ann. § 627:5.  Under this statute, reasonableness is determined by an objective standard. State v. Cunningham, 159 N.H. 103, 107 (2009).  Levy

does not argue that Lique knew that her arrest was illegal, nor does the defendants' version of the incident support that proposition.  Therefore, Levy cannot prevail on summary judgment on the assault and battery claim.

### 3.    <u>Supervisory Liability Claims</u>

Lastly, Levy argues that she is entitled to summary judgment on her supervisory liability claims against Chief Alexander and the City of Lebanon.  In her complaint, Levy alleges that they failed to adequately train and supervise Lique regarding the proper use of force.  She presents no evidence to that effect, however, as her arguments in the motion papers rest entirely on defendants' alleged failure to adequately train Lique on the protective custody standards and procedures.  Even assuming that his supervisors were negligent in regard to protective custody training, Levy has not alleged this as a basis for relief in her complaint.  I therefore deny the motion.[1]

_____

[1] I note that even if Levy had asserted a claim for failure to train and supervise with respect to protective custody issues, she would not prevail on that claim on summary judgment. Although Lique and Perkins admit that they received only two-hour training on the protective custody standards and procedures, a jury could conclude that the training was sufficient.

**B.   Lique's Motion**

Lique moves for summary judgment on all claims against him. He argues that he was authorized to take Levy into protective custody and that he did not use excessive force in the course of the arrest.  Alternatively, he contends that he is entitled to qualified immunity on Levy's Fourth Amendment claim and official immunity on her assault and battery claim.

Lique does not argue that that he is entitled to summary judgment if I accept as true the evidence Levy has submitted in opposition of the motion — namely her deposition detailing how Lique beat and tasered her in the back of his cruiser without a provocation.  Instead, Lique bases his motion on the premise that Levy's evidence should be disregarded as unreliable and the motion decided based on his evidence.  Specifically, he argues that Levy's mental illness rendered her unable to accurately perceive and remember her encounter with Lique on the day in question.  He attributes her claim of an unprovoked beating and tasering to an "acute delusional and hallucinatory episode of schizophrenia at the time of the incident."  Doc. No. 24-1.  He supports his contention with the testimony of an expert witness who reviewed Levy's medical records and the reports of the

17

incident and concluded that "there is very strong evidence that [Levy's] claims against the Lebanon Police Department spring from unreliable psychotic thinking."  Doc. No. 24-3 at 7. Consequently, Lique argues, I should disregard Levy's evidence as unreliable and decide the motion based on his version of the events.[2]

The credibility of Levy's evidence is an issue of fact for the jury and cannot be determined at the summary judgment stage. I am not free to reject her evidence simply because she suffered from a mental illness that may have altered her perception of the reality at the time of the incident.  Rather, for the purpose of Lique's motion, I must accept as true Levy's evidence and draw all reasonable inferences in her favor.  See Navarro,

---

[2] Lique also relies upon the absence of any notation in Levy's medical records from the DHMC or the state hospital that she had been beaten or tasered as proof that her claim is based on a paranoid belief she developed during the alleged psychotic episode.  Levy responds with an affidavit of Earl Carrel, an attorney who represented her in connection with her involuntary hospital admission after the incident with Lique.  Carrel states that when he interviewed Levy shortly after her admission, she showed him bruises on the left side of her torso.  Doc. No. 20-11.  Levy's father and daughter also state in sworn affidavits that they noticed bruising on Levy's body when they visited her in the hospital.  See Doc. No. 28-6; Doc. No. 28-10.  Her evidence, therefore, is easily sufficient to demonstrate the existence of a genuine dispute as to a material fact on the issue.

261 F.3d at 94.  Because Lique does not argue that he is
entitled to summary judgment if I accept Levy's evidence, I deny
his motion.

## C.   **Supervisors' Motion**

In her complaint, Levy claims that Chief Alexander and the
City of Lebanon are liable for failing to adequately train and
supervise Lique on the proper use of force.  She asserts a
Section 1983 claim against Chief Alexander and a common law
claim for negligent training and supervision against Chief
Alexander and the City.  Both defendants move for summary
judgment.

### 1.   **Section 1983 Claim against Chief Alexander**

"Supervisory liability under 42 U.S.C. § 1983 cannot be
predicated on a *respondeat superior* theory, but only on the
basis of the supervisor's own acts or omissions."  Seekamp v.
Michaud, 109 F.3d 802, 808 (1st Cir. 1997) (internal citations,
alterations, and quotation marks omitted); see Ashcroft v.
Iqbal, 129 S. Ct. 1937, 1948 (2009).  A supervisor is liable for
the subordinates' actions if:

> (1) the behavior of his subordinates results in a
> constitutional violation, and (2) the supervisor's action
> or inaction was affirmatively linked to that behavior in
> that it could be characterized as supervisory

19

> encouragement, condonation or acquiescence or gross
> negligence amounting to deliberate indifference.

Seekamp, 109 F.3d at 808 (internal quotation marks and

alterations omitted).  "[T]he 'affirmative link' required

between the action or inaction of a supervisor and the behavior

of subordinates contemplates proof that the supervisor's conduct

led inexorably to the constitutional violation."  Id. (internal

quotation marks omitted).

Even if Lique violated Levy's constitutional rights by

using excessive force in effecting her arrest, her Section 1983

claim against Chief Alexander fails because she has presented no

evidence that the Chief was deliberately indifferent to proper

police training on the use of force, the claim she asserts in

her complaint.  She does not dispute that Lique was trained in

the use of force at the New Hampshire Police Academy or that he

subsequently received annual training on the use of force

continuum.

In fact, in objecting to Chief Alexander's motion, Levy

does not even argue that he failed to train Lique on the proper

use of force.  Instead, she contends that the Chief is liable

because he failed to adequately train Lique with regard to

protective custody, which made Lique ill-equipped to identify

mentally ill individuals who pose a threat to themselves or
others.  As I explained above, Levy did not assert a cause of
action for unlawful arrest against Lique nor has she claimed
that Chief Alexander is liable because he failed to adequately
train him regarding the protective custody standards and
procedures.  Therefore, in the absence of competent evidence
that Chief Alexander inadequately trained Lique regarding the
use of force, the Chief is entitled to summary judgment on
Levy's Section 1983 claim against him.

### 2.   Negligent Training and Supervision Claim

Levy also asserts a negligent training and supervision
claim against Chief Alexander and the City of Lebanon.  The
record is bare of any competent evidence that would substantiate
this claim.

New Hampshire recognizes "a cause of action against an
employer for negligently hiring or retaining an employee that
the employer knew or should have known was unfit for the job so
as to create a danger of harm to third persons."  Marquay v.
Eno, 139 N.H. 708, 718 (1995).  To prevail on the claim, Levy
would have to show that Lique was "incompetent, inexperienced or
unskilled in a way that caused [her] injury, the risk of which

was within the scope of [his] employment and was known to the employer-municipality." Cutter v. Town of Farmington, 126 N.H. 836, 841 (1985) (first alteration added).  She has presented no evidence that either Chief Alexander or the City knew or should have known of a risk of Lique's incompetence in the use of force.  Rather, the uncontested evidence shows that Lique received annual training on the broadly utilized continuum of force.  I therefore grant the motion for summary judgment on the negligent training and supervision claim.[3]

## IV.   CONCLUSION

For the aforementioned reasons, I deny Levy's motion for summary judgment (Doc. No. 28), deny Lique's motion for summary judgment (Doc. No. 24) and grant Chief Alexander and the City's

---

[3] Because Levy has not asserted any claim of negligent training or supervision on the basis of a failure to provide officers with adequate knowledge of the protective custody standards and procedures, I need not examine whether the evidence submitted would support such a claim.  I further note, that even if Levy had asserted such a claim, I would grant the City's motion because a municipality is immune from liability arising out of its performance of discretionary functions such as decisions regarding the training and supervision of municipal employees. See Austin v. Town of Brookline, No. 00-284-JD, 2001 WL 1117103, at *7 (D.N.H. Sept. 21, 2001); Hacking v. Town of Belmont, 143 N.H. 546, 550 (1999).

motion for summary judgment (Doc. No. 21).

     SO ORDERED.


                   /s/Paul Barbadoro
                   Paul Barbadoro
                   United States District Judge


May 7, 2012

cc:   Stephen T. Martin, Esq.
      Brian J. S. Cullen, Esq.
      Daniel J. Mullen, Esq.